# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kristi Ann Webb,                              **Civil No. 13-cv-1491 (DWF/SER)**

      Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

      Defendant.

---

Gary A. Ficek, Esq., 15 Broadway, Suite 301, Fargo, North Dakota 58102, for Plaintiff.

Ann M. Bildtsen, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kristi Ann Webb ("Webb") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits ("DIB").  *See* (Compl.) [Doc. No. 1].  The parties filed cross-motions for summary judgment ("Webb's Mot. for Summ. J." and "Commissioner's Mot. for Summ. J.," respectively) [Doc. Nos. 10, 12] that have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and District of Minnesota Local Rule 72.1.  For the reasons below, the Court recommends that Webb's Motion for Summary Judgment be denied and the Commissioner's Motion for Summary Judgment be granted.

## I.      BACKGROUND

### A.      Procedural History

Webb protectively filed her application for DIB on December 12, 2010, alleging a disability onset date ("AOD") of January 22, 2010.[1]  (Admin. R.) [Doc. No. 8 at 11].[2]  Webb's application was denied initially on March 24, 2011, and upon reconsideration on May 16, 2011. (*Id.*).  Following Webb's request, Administrative Law Judge ("ALJ") Hallie E. Larson heard the matter.  (*Id.* at 11, 23, 28–66).  The ALJ issued an unfavorable decision determining Webb did not meet the statutory requirements for being disabled.  (*Id.* at 23).  The Appeals Council denied Webb's request for review, rendering the ALJ's decision final.  (*Id.* at 1–5).

### B.      Webb's Background and Testimony

Webb testified that she was fifty-four years old at the time of the hearing, attended four years of college receiving her nursing degree, lived alone, and drove—avoiding interstates.  (*Id.* at 37).  The conditions for which Webb applied for DIB arose after her treatment with Tamoxifen for breast cancer.[3]  (*Id.* at 41).  Webb's employment as a nurse ended shortly after

---

[1]      Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits.  The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to Social Security Administration on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27.  Program Operations Manual System ("POMS"),    GN    00204.010C.5a–e.    (SSA,    Aug.    6,    2013)    *available at*  https://secure.ssa.gov/apps10/poms.nsf/ lnx/0200204010.    There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for Title II benefits must be documented and signed by a SSA employee.  POMS, GN 00204.010B.1 – GN 00204.010B.4.

[2]      The page numbers refer to those at the bottom right-hand corner of the page.  The Court uses this pagination because it is continuous across the multiple exhibits constituting the entire administrative record.

[3]      Tamoxifen is a medicine that blocks the effects of the estrogen hormone in the body. It is used to treat breast cancer in women or men. It may also be used to treat other kinds of cancer, as determined by [a] doctor. . . . The exact way that

January 22, 2010, largely due to Webb's performance and behavioral issues.  (*Id.* at 37–38).  Webb did not look for any work after this because she knew she could not work.  (*Id.* at 38–39).

Webb had no additional problems with her breast cancer, and took an antidepressant, a medication for periodic leg movement disorder, melatonin, and an over-the-counter ("OTC") medication for sleep problems.  (*Id.* at 39–40).  Most of the medications she had tried for anxiety and depression caused adverse reactions.  (*Id.* at 40–41).

Webb's anxiety, which was not present before her treatment with Tamoxifen, led to struggles with initiating projects, rumination, and, at times, caused a shortness of breath and shakiness.  (*Id.* at 41).  Her depression caused her mood to slide downward, making her more isolative, and elongated the two to three hours it took her to get focused, showered, and ready in the morning; nevertheless medications helped.  (*Id.* at 41–42).

On a typical day, Webb worked on a crossword puzzle but only for short periods of time because she was antsy, did not really take care of household chores, and could only make meals not requiring a recipe.  (*Id.* at 42–44). Webb also did her laundry about once or twice a month with significant planning, mowed her lawn with breaks, watered flowers, and paid her bills— although she recently received a late notice and she ruminated over paying them.  (*Id.*).  Webb went out to eat or visited friends infrequently, read some—but only books from authors she used to read, spent about an hour on three separate occasions on her computer daily checking e-mail and reading news articles, attended a weekly mosaic class but was not close to completing her project, and gardened one hour a week.  (*Id.* at 44–46).

---

Tamoxifen works against cancer is not known, but it may be related to the way it blocks the effects of estrogen on the body.

*Tamoxifen (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/tamoxifen-oral-route/description/DRG-20066208.

Webb, in explanation of why she felt unable to work, stated:

I would say initiation of any task is extremely difficult.  When placed in front of—something placed in front of me, in the past, I was the queen of multitasking, and now it's difficult to just start.  [I] can only complete one task in its entirety before moving on to the next because if I don't finish one and move on to two, I will never go back to one.  As I said, I've—I have the ability to learn new information to a degree, but the recall of that new information, to learn something and then have someone say, "Okay, show me back" it just will draw a blank.  My sensory gait issues, not being tolerant of noise and sound and activity around me makes it very difficult to concentrate.  It's like my head is filled with white noise.  And when I was working, I would come home at the end of the day and literally [feel] like my head was filled with noise and my ears hurt from all the noise.  And even being at a friend's house, that continues to be an issue.  Their telephone rings, I jump.  The kids are loud, the dogs are barking, I last about an hour usually and then [its] got to go.

(*Id.* at 46–47).

Webb eventually refused to take Tamoxifen for her breast cancer treatment because she felt that it had "literally fried [her] brain" and her oncologist told her that this was common for women of her age.  (*Id.* at 48–49).  Webb believed she experienced "extreme chemo brain" and it was affecting her work—it caused her to have "a major meltdown."  (*Id.* at 49–50).  Before the chemotherapy, Webb generally enjoyed work, acted in a supervisory capacity, and could multi-task, but now she had a difficult time carrying out even one simple activity.  (*Id.* at 50–53).

On certain days, Webb would not get dressed after getting up and was so tired she napped until the afternoon before showering—all attributable, according to her, to depression.  (*Id.* at 55).  She had to take naps daily and there were some days (sometimes two to three days in a week) when she had no human contact at all.  (*Id.* at 55–56).  None of Webb's therapists or other medical professionals suggested that a daily routine would be good for her.  (*Id.* at 56–57).

### C.    Relevant Medical Record Evidence

Certain medical records in the Administrative Record concern conditions which neither the parties nor the ALJ base their analysis on—such medical records will not be summarized.

4

### 1.    Medical Records Before the AOD

Before her AOD, Webb visited Dr. Robert Olson ("Dr. Olson") twice, on June 8, 2009, and December 2, 2009, to address her cognitive impairment following Tamoxifen treatment and her depression.  (Admin. R. at 362, 367–69).  On June 8, 2009, Dr. Olson diagnosed Webb with recurrent major depression and post-traumatic stress disorder ("PTSD").  (*Id.* at 368).  At this visit, Webb stated that after stopping Tamoxifen, she felt better and had been stable on her current medications.  (*Id.* at 367).     Dr. Olson continued Webb's current medication, Effexor.[4] (*Id.* at 368).  Dr. Olson assigned Webb a GAF of 62.[5]  (*Id.* at 368).  On December 2, 2009, Webb followed up, complaining her conditions were worse.  (*Id.* at 362).  Webb explained that she had been working with rape and abuse counseling because of past abuse and had experienced increased ruminating and worry about her work performance.  (*Id.*).  Dr. Olson switched Webb to the generic version of Effexor, continued psychotherapy, and restarted her Seasonal Affective Disorder ("SAD") light.  (*Id.* at 363).  Webb's GAF score was 62.  (*Id.*).

---

[4]     Effexor is a brand name for venlafaxine, which "is used to treat depression. It is also used to treat general anxiety disorder (GAD), social anxiety disorder (SAD), and panic disorder." *Venlafaxine (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379.

[5]     GAF scores are a reflection of the examining clinician's personal assessment of an individual's social, occupational, and psychological functioning.  GAF scores of 41–50 indicate serious symptoms or any serious impairment in societal, occupational, or school functioning. GAF scores of 31–40 indicate an impairment in reality testing or communication or major impairment in several areas.  GAF scores of 21–30 indicate that one's behavior is considerably influenced by delusions or hallucinations or serious impairments in communications or judgment in almost all areas.  These numbers are assigned pursuant to the examining clinician's opinion.

*Mortensen v.Astrue*, No. 10-CV-4976, 2011 WL 7478305 (JRT/JJG), at *2 nn. 4–5 (D. Minn. Sept. 30, 2011) *report and recommendation adopted*, 2012 WL 811510 (D. Minn. Mar. 12, 2012) (citing *Diagnostic and Statistical Manual of Mental Disorders*, 31–40 (4th ed., Am. Psychiatric Ass'n 1994) (DSM–IV–TR)) (internal citations omitted).

The record reflects three separate visits concerning Webb's breast cancer—which is not itself a basis for her claim—before her AOD.  (*Id.* at 365, 370, 380, 388).  In February and June 2009, Webb saw Dr. Louis Geeraerts, M.D. ("Dr. Geeraerts") who specifically noted Webb discontinued Tamoxifen because of Webb's view that it made her develop severe depression; Webb's depression improved after she stopped taking Tamoxifen.  (*Id.* at 384, 391).

### 2.    Medical Records After the AOD

#### i.    2010 Records

In 2010, Webb saw Dr. Olson and Rodney Swenson, Ph.D., ABN ("Dr. Swenson") for neuropsychological issues including Webb's cognitive difficulties after Tamoxifen treatment and depression.  Also, many appointments involved medication management.

On January 29, 2010, Webb explained that she had problems at work.  (*Id.* at 359–60).  She experienced an uncharacteristic lack of impulse control and irritability and struggled with depression.  (*Id.* at 359).  Dr. Olson noted that he would research the connection between Tamoxifen and her symptoms and referred Webb to Dr. Swenson for a neuropsychological review.  (*Id.* at 360).  Dr. Olson assigned Webb a GAF score of 51.  (*Id.*).

On February 8, 2010, Webb saw Dr. Swenson and expressed the same struggles as she had to Dr. Olson.  (*Id.* at 305–08).  Dr. Swenson diagnosed Webb as having memory loss/disturbance, many symptoms suggesting executive dysfunction, and PTSD.  (*Id.* at 308).

The following day, Dr. Swenson administered comprehensive neuropsychological testing yielding mildly abnormal results.  (*Id.* at 301–03).  Webb was definitely experiencing problems with attention span, word retrieval, visual spatial abstraction, speed of processing, and some incidental learning.  (*Id.* at 303).  Webb's "clinical history suggest[ed] that under stressful and high demand situations [Webb was] likely showing more difficulty with complex attentional

processing, speed of processing and this [was] leading to fatigue and irritability." (*Id.*).  Dr. Swenson stated "[t]hough [Webb's] deficits would fall in the mild to subtle categories, they are likely playing out in a significant manner in her work place setting." (*Id.* at 304).

Webb saw Dr. Olson the following day for a psychiatric follow-up. (*Id.* at 357).  Dr. Olson advised Webb to continue using her SAD light and medications. (*Id.* at 357–58).  Dr. Olson noted that he "remain[ed] concerned about [Webb's] concentration and memory abilities[,]" and believed that Webb should continue her absence from work. (*Id.* at 358).

Approximately a week later, Dr. Swenson explained that the testing provided definite evidence of fluctuations in Webb's attention. (*Id.* at 299–300).  Dr. Swenson told Webb "the types of difficulties she [was] having would likely be more evident when she [was] under a high demand situation such as in the work place." (*Id.* at 300).  Dr. Swenson opined that the testing "validate[d] her perceptions with respect to the feedback she was getting at work and given her position [as a pediatric nurse] this [did] raise concern about her capacities to work in an efficient and safe manner." (*Id.*).

On March 10, 2010, Webb again saw Dr. Olson. (*Id.* at 346).  Dr. Olson noted that Dr. Swenson found "some significant cognitive issues with [Webb] including executive functioning and concentration." (*Id.*).  He reported Webb did not tolerate heightened Effexor and was using her SAD light. (*Id.*).  Dr. Olson assigned Webb a GAF score of 55, reduced her Effexor, and opined Webb remained unable to work. (*Id.* at 347).

A little over a month later, Webb again followed-up with Dr. Olson stating she had an improved mood with the lower dose of Effexor. (*Id.* at 344).  Webb described restlessness at night. (*Id.*).  Dr. Olson reviewed some recent journal articles that Webb brought, noting the mixed results, and Dr. Olson explained some linked Tamoxifen to cognitive difficulties. (*Id.*).

Webb followed up again with Dr. Olson on June 1, 2010. (*Id.* at 337). Dr. Olson maintained Webb's medications and expressed his belief that Webb was "unable to function in her employment as a nurse due to the cognitive struggles." (*Id.* at 338).

Approximately six weeks later, Webb returned, complaining specifically of her inability to multi-task, feelings of apathy, and concentration problems. (*Id.* at 335). Dr. Olson stated "it is clear that [Webb] continue[d] to struggle." (*Id.*). Dr. Olson continued the lower Effexor dose, prescribed Aricept, and discussed other treatment options.[6] (*Id.* at 336). Dr. Olson assigned Webb a GAF score of 55. (*Id.*).

As instructed, Webb retuned to see Dr. Olson on September 2, 2010. (*Id.* at 329). Dr. Olson referred Webb to Dr. Swenson for additional testing. (*Id.* at 330). Dr. Olson assigned Webb a GAF score of 55. (*Id.*).

One week later, Webb saw Dr. Swenson. (*Id.* at 297–98). Webb noted that she had to stop taking a new medication Dr. Olson prescribed because of the side effects, felt her behavior was more disinhibited, more irritable and distracted, and she had problems in sensory gaiting. (*Id.* at 297–98). Webb said her depression was the best it had been in a long time. (*Id.* at 298).

A few days later, on September 15, 2010, Dr. Swenson again tested Webb's cognitive abilities. (*Id.* at 293–96). After testing, Dr. Swenson noted:

> [t]he neuropsychological reevaluation for [Webb] does show some evidence of improvement which seems to be correlated with better emotional functioning and reduced demands being placed on her brain function  The test results, however, are still abnormal, showing impairments in attention and mental control, difficulties with mental calculations, difficulties with incidental learning, and subtle executive function impairments with verbal sequencing and nonverbal problem solving probably the most obvious.

---

[6]      Aricept is the brand name for donepezil, which "is used to treat dementia (memory loss and mental changes) associated with mild, moderate, or severe Alzheimer's disease." *Donepezil (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/donepezil-oral-route/description/drg-20063538.

(*Id.* at 295).

Approximately two weeks later, Webb returned to see Dr. Swenson reporting problems in sensory gaiting, attention, anger, and stress. (*Id.* at 291–92).  Although Dr. Swenson noted that Webb was stabilized emotionally, she still had episodes when she could not regulate her emotions.  (*Id.* at 291–92).  Both Webb and Dr. Swenson agreed that she could not function as a nurse.  (*Id.* at 292).  Dr. Swenson noted improvement in her psychological status with the removal of work stressors and explained that it was not unusual for cancer patients who have had chemotherapy to develop some attention and executive function problems that people with PTSD also experienced.  (*Id.*).  Dr. Swenson opined that Webb's combination of impairments created the cognitive difficulties she experienced.  (*Id.*).

In early October 2010, Webb returned to see Dr. Olson noting her struggles with apathy, multitasking, overstimulation, and concentration problems.  (*Id.* at 316).  Dr. Olson assigned Webb a GAF of 55 and added a medication to attempt to target Webb's mood and concentration/attention concerns.  (*Id.* at 317).

Webb returned to follow-up with Dr. Olson on November 22, 2010 and explained that she could not tolerate the additional medication that Dr. Olson last prescribed.  (*Id.* at 319).  Dr. Olson continued Webb on the Effexor, regular use of SAD light, and suggested a sleep evaluation.  (*Id.* at 320).  Dr. Olson assigned Webb a GAF score of 55.  (*Id.*).

### ii.       2011 and 2012 Records

In 2011, Webb saw Dr. Olson seven times.  (*Id.* at 402, 406, 445, 454, 458, 467, 473, 488).  On February 21, 2011, Webb told Dr. Olson that she discontinued Effexor due to side effects and weaning off the Effexor improved her anxiety, but she was still irritable.  (*Id.* at 406).

Webb continued to struggle—mood and irritability remained a problem. (*Id.* at 407). Dr. Olson prescribed Lamictal and assigned Webb a GAF score of 54. (*Id.*).[7]

At the six week follow-up with Dr. Olson, Webb reported continued symptoms from stopping her Effexor. (*Id.* at 402). In addition, Webb had also discontinued using the Lamictal because she felt it added to her irritability. (*Id.*). Webb had met with a pharmacologist to review her medication options. (*Id.*). Dr. Olson stated that Webb had been turned down for Social Security and "[t]here [have] been questions about possible vocational rehabilitation but I discussed options for cognitive rehabilitation. At this point [I] do not feel is realistic for her to return to any type of work, we did discuss a careful trial of a small amount of volunteering[.]" (*Id.*). Dr. Olson explained that Webb had a hard time tolerating psychotropic medication, and was reluctant to try a new medication because of her recent side effects. (*Id.* at 403). Dr. Olson advised Webb to try some limited volunteering, discussed cognitive rehabilitation, and assigned Webb a GAF of 53. (*Id.*).

Webb followed up with Dr. Olson on May 23, 2011, and complained that she was not tolerating Lamictal, which was restarted after Webb experienced increased depression. (*Id.* at 488). Webb had thoughts of wishing she were dead. (*Id.*). Webb also continued to struggle with sensory overload and initiation. (*Id.*). Dr. Olson assigned Webb a GAF score of 51, stopped Lamictal, and started Celexa.[8] (*Id.* at 490).

---

[7]      Lamictal is the brand name for lamotrigine, which "is used alone or together with other medicines to help control certain types of seizures . . . [; i]t can also be used in the treatment of bipolar disorder (manic-depressive illness) in adults older than 18 years of age." *Lamotrigine (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/description/DRG-20067449

[8]      Celexa is the brand name for citalopram, which is used "to treat depression[, and] belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). These medicines are thought to work by increasing the activity of a chemical called serotonin in the

A few weeks later, Webb followed up with Dr. Olson, explaining that Celexa was beginning to cause mood improvement, but she was still experiencing anxiety and initiation struggles.  (*Id.* at 473).  Dr. Olson assigned Webb a GAF score of 52 and considered increasing Webb's Celexa dosage.  (*Id.* at 474).

A month later, Webb explained that she had been taking a higher dose of Celexa that provided some mood benefit but increased restlessness; she completed more around the house and was more talkative but had difficulties reading and watching television.  (*Id.* at 467).  Webb's anxiety improved and she received some benefits from a mindfulness class, but she still struggled with memory and concentration.  (*Id.*).  Dr. Olson assigned Webb a GAF score of 55, reviewed treatment options, and continued Celexa.  (*Id.* at 469).

Approximately seven to eight weeks later, Webb followed up for medication management.  (*Id.* at 454, 458).  The different doses of Celexa that Webb tried caused side effects.  (*Id.*).  Webb felt increased situational stress and struggled with executive functioning, getting overwhelmed, and lacking focus and concentration.  (*Id.*).  Dr. Olson assigned Webb a GAF score of 55, and discussed treatment options.  (*Id.* at 456, 460).

On December 12, 2011, Webb explained to Dr. Olson that she had struggled since she had a colonoscopy in late October 2011, because it triggered flashbacks to her past trauma.  (*Id.* at 445).  Despite adjustments in her Celexa she experienced a lack of energy, concentration, and motivation, but did not feel depressed.  (*Id.* at 445–47).

---

brain."  *Citalopram (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/DRG-20062980.

On March 8, 2011, Webb had a consultative examination with Amy Ochsendorf, Psy. D., Psychology Resident ("Dr. Ochsendorf").[9] (*Id.* at 394–401). Dr. Ochsendorf explained that Webb drove and arrived to her appointment by herself and inquired what type of testing would be performed. (*Id.* at 394). Webb reported her history to Dr. Ochsendorf. (*Id.* at 395–96). Webb complained of increased irritability, difficulties with concentration, and problems in the employment setting. (*Id.* at 396). Webb told Dr. Ochsendorf that she had undergone psychological testing twice, and:

> the first time she was noted to have significant word-finding difficulties and moderate to significant deficits of attention and concentration. She reported she initially attempted to work hard on the attention tasks, but eventually did not care because it was boring. She indicated the second time she was assessed, her testing performance had improved. According to Webb, Rod Swenson reported that her improvements on testing were related to not being stressed with work. According to Ms. Webb, Rod Swenson indicated that it was "unsafe for her to work as a nurse or in any environment due to her deficits." Ms. Webb reported that she is more psychologically adjusted when she is not working and that "not working is a matter of wellness and that's just the way it is."

(*Id.*). Dr. Ochsendorf had access to Dr. Olson's records from June 2009, to April 2010, but she did not have Dr. Swenson's test results—she only had Dr. Olson's notes explaining that Webb had significant and likely persistent cognitive difficulties of executive function. (*Id.* at 396–97).

Webb had a few close friends, but she did not often visit them. (*Id.* at 397). Webb stated that she was able to pay her bills most of the time and did not report difficulties in money

---

[9] A consultative examination will be performed if:

> [the claimant's] medical sources cannot or will not give [the SSA] sufficient medical evidence about [the claimant's] impairment for [the SSA] to determine whether [the claimant is] disabled or blind, [the SSA] may ask [the claimant] to have one or more physical or mental examinations or tests. [The SSA] will pay for these examinations. However, [the SSA] will not pay for any medical examination arranged by [the claimant or the claimant's] representative without [the SSA's] advance approval.

20 C.F.R. § 416.917.

management.  (*Id.* at 400).  Dr. Ochsendorf noted "during today's assessment, Webb was able to respond appropriately to brief and superficial contact; however, she reportedly has had difficulty interacting with coworkers in the past due to difficulties with distress tolerance related to her job tasks."  (*Id.*).  Dr. Ochsendorf explained:

> [w]hile Webb's reported deficits have interfered with her ability to perform as a nurse, it is unclear if she would be able to tolerate the stress and pressures typically found in a more entry-level-type of workplace.  She reportedly did well with job tasks that were routine, which would minimize her concentration difficulties.  It is likely that other job tasks that are more routine and predictable may be adequately managed by Webb.

(*Id.*).

On February 6, 2012, Webb noted some improvement including decreased anxiety at a visit with Dr. Olson.  (*Id.* at 439).  Webb continued to struggle with executive functioning.  (*Id.*).  Dr. Olson assigned Webb a GAF score of 51, and continued Celexa.  (*Id.* at 441).

Also in March 2012, Pat Olson M.ED., LPCC, of the Rape and Abuse Crisis Center (the "Center") in Fargo, North Dakota, wrote a letter explaining that Webb had been seen at the Center for thirty-four counseling appointments since January 12, 2011.  (*Id.* at 409). The letter explained that Webb had flashbacks and intrusive thoughts, in addition to the significant changes she had experienced since her cancer treatment, including increased intrusive thoughts, and a severe flashback during a colonoscopy.  (*Id.*).

### 3.    Opinions from Webb's Medical Providers

On August 29, 2011, Dr. Swenson completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("MSS") and a Psychiatric Review Technique ("PRT").[10]

---

[10]    A PRT is:

> described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) [, and] requires adjudicators to assess an

(*Id.* at 498–514). In the MSS, Dr. Swenson noted that Webb had no restriction in understanding, remembering, and carrying out simple instructions; was restricted mildly in her ability to make judgments on simple work-related decisions; experienced moderate restrictions in the ability to make complex, work-related decisions; and was restricted markedly in understanding, remembering, and carrying out complex instructions. (*Id.* at 498). Webb's neuropsychological assessment had revealed continuing difficulties even after Webb had control of her stress and depression. (*Id.*). Webb's ability to interact with others in the work setting was affected by her impairments; Webb had moderate restrictions in interacting appropriately with the public, supervisors, co-workers, and responding appropriately to usual work place situations and changes in work routine. (*Id.* at 499).

Dr. Swenson completed his PRT for the period from February 8, 2010 to September 29, 2010. (*Id.* at 502). Dr. Swenson opined that Webb's conditions met or equaled listing 12.02 for organic mental disorders.[11] (*Id.*). Webb had perceptual or thinking disturbances, emotional

---

individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).

[11] In the SSA's evaluation of mental impairments, after the degree of functional limitation resulting from the impairments has been determined, the severity of the mental impairments must be determined.

(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that

ability and impairment in impulse control, and loss of measured intellectual ability.  (*Id.* at 503).

After both testing and treatment, Webb showed "cognitive impairments in the areas of attention,

mental control, and executive function. . . [Webb] cannot function safely as a pediatric nurse."

(*Id.*).  Under listing 12.02, he opined that Webb had mild limitations in restriction of activities of

daily living, moderate difficulties in maintaining social functioning, marked difficulties in

maintaining concentration, pace, or persistence.[12]  (*Id.* at 504).  Finally, Dr. Swenson indicated

Webb had one or two episodes of decompensation of extended duration.[13]  (*Id.*).

---

there is more than a minimal limitation in your ability to do basic work activities (see § 416.921).

(2)      If your mental impairment(s) is severe, we must then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3)      If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

20 C.F.R. § 416.920a(d).

[12]      Concentration, persistence, or pace is defined as:

the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. § 404 app. 1, 12.00(C)(3).

[13]      Episodes of decompensation are defined as:

On March 12, 2012, Dr. Olson wrote a letter explaining that he had been Webb's treating psychiatrist for twelve years and had seen her effectively work as a nurse while suffering from depression and PTSD, but that Webb's current severe problems started after Webb's treatment for breast cancer.  (*Id.* at 410).  Dr. Olson stated that he prescribed many medications, but only Webb's mood, not her cognitive problems, had improved.  (*Id.*).

On March 12, 2012, Dr. Olson completed a MSS and a PRT for Webb.  (*Id.* at 411–27).  In the MSS, Dr. Olson opined that Webb had mild restrictions in her ability to understand, remember, and carry out simple instructions; marked restrictions in her ability to understand, remember, and execute complex instructions and in her ability to make judgments on simple work-related decisions; and had extreme restrictions in her ability to make judgments on complex work-related decisions.  (*Id.* at 425).  Dr. Olson listed neuropsychological testing,

---

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. § 404 app. 1, 12.00(C)(4).

ongoing symptoms, and failure in work setting as factors supporting his assessment.  (*Id.*).  Dr. Olson opined that Webb was mildly restricted in her ability to interact appropriately with the public in a work setting, moderately restricted in her ability to interact appropriately with supervisors and co-workers, and markedly restricted in her ability to respond appropriately to usual work situations and changes in work situations.  (*Id.* at 426).

Dr. Olson explained that his PRT was from January 2010 to March 2012.  (*Id.* at 411).  In his view, Webb met listings in Sections 12.02, organic mental disorders; 12.04, affective disorders; and 12.06, anxiety-related disorders.  (*Id.*).  Webb had psychological or behavioral abnormalities evidenced by memory impairment, changes in personality, and disturbance in mood.  (*Id.* at 412).  When asked to list symptoms supporting his opinion, Dr. Olson wrote:

> Since exposure to chemotherapy 2007 [to] 2009 for breast cancer, [Webb] has struggled with problems of concentration, focus, [and] decision[-]making. [Webb's] executive functioning skills have been impaired as well as ability to cope and stressors.  [Webb] was no longer able to function effectively as a nurse and has been removed from work.  New psychological testing by Dr. Swenson found evidence of cognitive change.

(*Id.*).  Webb suffered from mood disturbances or depressive symptoms evidenced by pervasive loss of interest in almost all activities, sleep disturbances, decreased energy, feelings of worthlessness or guilt, and difficulty concentrating or thinking.  (*Id.* at 414).  When asked to list symptoms substantiating the impairment, Dr. Olson wrote "major depressive symptoms have been episodically recurring problem."  (*Id.*).  Webb suffered from anxiety-related disorders as evidenced by recurrent, intrusive recollections of a traumatic experience which are a source of marked distress.  (*Id.* at 416).  When asked to list symptoms and findings that substantiated his opinion, Dr. Olson wrote "[p]ost traumatic stress symptoms have been ongoing over the years." (*Id.*).  Dr. Olson stated that Webb's mental disorder caused a moderate restrictions of activities of daily living and difficulties in maintaining social functioning; marked limitations in difficulties

in maintaining concentration, persistence, or pace; and three episodes of decompensation, each

of extended duration.  (*Id.* at 421).  Dr. Olson's notes revealed that:

> Webb has long history of PTSD—trauma when young, compounded by intermittent episodes of major depression over the years.  However, she was able to overcome these and work competitively as a nurse for many years.  Her severe problems began after chemotherapy for breast cancer—she began to have increasing problems functioning at work—made uncharacteristic mistakes, had concentration and memory problems.  [Webb was] overloaded by stimuli easily, which was a large change in her abilities.  Her ability to sort through complex work[-]related issues became compromised and she was unable to continue working.  New psychological testing found deficits in concentration, memory, and executive functioning.  Medication treatment has helped her mood, counseling has helped [combat] the PTSD symptoms to a degree but the cognitive changes have continued.

(*Id.* at 423).

### D.    State Agency Medical Consultants' Opinions

At the initial level, Amy S. Johnson, Ph.D. ("Dr. Johnson") found that Webb had mild

restrictions in activities of daily living, mild difficulties in maintaining social functioning,

moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes

of decompensation of extended duration.  (*Id.* at 87).  Webb was deemed fully credible.  (*Id.* at

88).  Dr. Johnson assigned Webb a mental RFC and opined that:

> [t]he evidence suggests [Webb] can understand, remember, and carry-out unskilled tasks.  [Webb] can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors.  [Webb] can attend to [tasks] for sufficient periods of time to complete tasks.  [Webb] can manage the stresses involved with unskilled work.

(*Id.* at 90).

Dr. Johnson's mental RFC determination for Webb included: (1) understanding and

memory limitations including no significant limitations in ability to remember locations and

work-like procedures or the ability to understand and remember very short and simple

instructions with moderate limitations in the ability to understand and remember detailed

instructions; (2) sustained concentration and persistence limitations including no significant limitations in the ability to carry out very short and simple instructions, the ability to perform activities within a schedule with regular attendance and punctuality, the ability to sustain an ordinary routine without special supervision, and the ability to make simple work-related decisions, moderate limitations in the ability to carry out detailed instructions, the ability to work in coordination with or proximity to others without being distracted, and the ability to maintain attention and concentration for extended periods; (3) social interaction limitations including no significant limitations in the ability to maintain socially appropriate behavior and basic neatness and cleanliness standards and the ability to ask simple questions or request assistance and moderate limitations in the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism of supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (4) adaption limitations including no significant limitations in awareness of normal hazards and an ability take appropriate precautions, the ability to travel in unfamiliar places or use public transportation, or the ability to set realistic goals or make plans independently of others and moderate limitations in the ability to respond appropriately to changes in the work setting. (*Id.* at 88–90).

At the reconsideration level, no new changes in condition, illnesses, or injuries were reported. (*Id.* at 99–100). Ray M. Conroe Ph.D. L.P. ("Dr. Conroe") assigned the same RFC as Dr. Johnson had at the initial level. (*Id.* at 102–05). In addition, Dr. Conroe stated Webb "would do well with job tasks that were more routine." (*Id.* at 101).[14]

---

[14]    Concerning physical impairments, at the initial level, Charles T. Grant, M.D. ("Dr. Grant") and at the reconsideration level, Gregory H. Salmi, M.D. ("Dr. Salmi") found Webb had no severe physical impairment. (*Id.* at 85–86, 99–100).

### E.      Vocational Expert Testimony

Steve Bosch ("Bosch") testified as a vocational expert ("VE") at the hearing.  (*Id.* at 58–64).   The VE holds a Bachelor's of Science Degree from Mankato State University and a Masters of Science Degree from Drake University.  (*Id.* at 196–97).  The VE identified Webb's past work as a nurse as skilled, medium exertion per the DOT, and very heavy exertion per Webb's description.  (*Id.* at 59).  The ALJ asked the VE to assume the following conditions for the hypothetical question she would pose to him:

> An individual of [Webb's] closely approaching advance[d] age, more than a high school education, past work experience as you have previously summarized, who has the [RFC] to perform the physical demands of work and can handle exposure to noise and intensity levels not above the moderate level as defined in the [Selective Characteristics of Occupations] .  From a mental standpoint, the individual is limited to understanding, remembering, and carrying out short, simple instructions, and interacting appropriately with co-workers and the general public on a brief and superficial basis.

(*Id.*)

The ALJ then asked the VE if an individual with such limitations could perform the work Webb had in the past, to which the VE responded that it would not be possible for such an individual to perform Webb's highly skilled past work.  (*Id.* at 60).  The ALJ then asked the VE whether there were any other jobs that he could identify within the stated conditions.  (*Id.*).  The VE responded:

> Yes.  Examples would include hand packaging activities.  . . . It is medium work, and it's unskilled.  And within the parameters of your hypothetical, there would be approximately 3,000 in the state of Minnesota, and 120,000 in the national economy.  Another job possibility would be employment as a kitchen helper, and . . . it too is medium work and is unskilled.  We have 5,000 in the state of Minnesota, and conservatively, 200,000 in the national economy.  And a third possibility within the hypothetical would be work as a janitor cleaner, . . . , medium, unskilled, within your hypothetical, 10,000 in Minnesota, 400,000 in the national economy.  That would be three examples.

(*Id.*).  The VE also confirmed that his testimony was consistent with the DOT.  (*Id.*).

Webb's attorney, in questioning the VE, referred to the limitations to which Dr. Olson testified. (*Id.* at 61). Webb's attorney asked the VE to keep in mind the second hypothetical that had been posed by the ALJ, but to change it in one respect. (*Id.*). Webb's attorney explained the hypothetical as including the proposition that there are no physical limitations that noise levels have to be at a moderate or lower level, that Webb could follow simple instructions and would have to be in a position with brief and superficial public interactions. (*Id.*). Webb's attorney then added the limitation that the individual has "marked limitations on the ability to make judgments on simple, work-related decisions." (*Id.*). The VE explained that a marked limitation is significant and explained that a marked limitation in making simple judgments would preclude the jobs he previously cited. (*Id.* at 61–62).

The VE testified that removing the marked limitation in the ability to make judgments and adding  a marked limitation in the ability to understand and remember complex instructions would not prevent performance of the jobs identified because the identified jobs are unskilled and can be learned by demonstration and no complex instructions would be involved. (*Id.* at 62). The VE testified that a marked limitation in the ability to carry out complex instructions would not prevent competitive employment. (*Id.*). The VE explained that adding a marked limitation on the ability to appropriately respond to customary work situations and changes in the work environment would likely eliminate the jobs he identified if such a limitation would cause a lack of concentration or an inability to meet performance requirements. (*Id.* at 63). Such a limitation would preclude all competitive employment. (*Id.*).

Webb's attorney then asked what the usual competitive tolerance was for absenteeism for days when an individual would call in and not be able to show up for work. (*Id.*). The VE testified if an individual did not show up for work or needed to leave work because of symptoms

more than twice a month for a few months it would result in the individual losing the job and not being able to sustain competitive employment. (*Id.*). The VE opined that individual who needed unscheduled breaks to gather herself and refocus and would need a nap during typical work hours would be precluded from competitive work. (*Id.*).

F.     **The ALJ's Decision**

On July 3, 2012, the ALJ issued a decision concluding that Webb was not disabled under the SSA, since the AOD through July 3, 2012, the date of the decision. (Admin. R. at 23). The ALJ considered: (1) whether Webb was engaged in substantial gainful activity; (2) whether Webb had a severe medically determinable impairment or a severe combination of impairments; (3) whether Webb's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); (4) whether Webb could return to her past work; and (5) whether Webb could do any other work in light of her residual function capacity, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f). (Admin. R. at 13–23). At the outset, before performing the five-step analysis, the ALJ noted that Webb met the insured status requirements of the Social Security Act through December 31, 2015. (*Id.* at 13).

At the first step, the ALJ found that Webb had not engaged in substantial gainful activity since January 22, 2010— the AOD. (*Id.*).

At the second step, the ALJ found that Webb had severe impairments including cognitive disorder, not otherwise specified; affective disorder; and post-traumatic stress disorder. (*Id.*).

At step three, the ALJ determined that Webb did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20

CFR 404, Subpart P, Appendix 1, §§ 12.02, 12.04, or 12.06.[15]   (*Id.*).   The ALJ considered whether "Paragraph B" requirements were satisfied.[16]   (*Id.*).   To meet "Paragraph B," a mental impairment must cause at least two of the following: (1) marked restriction of daily living activities;[17] (2) marked difficulties in maintaining social function; (3) marked difficulties in maintaining "concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."[18]   (*Id.* at 13–14).

Webb was mildly restricted in her activities of daily living.[19]   (*Id.* at 14).   Webb performed personal care without assistance, was adequately or well-groomed, made simple meals, performed household chores, shopped, managed her own money, and drove—avoiding interstates.   (*Id.*).   The ALJ explained Webb's "psychologically based symptoms mildly limit the frequency with which she performs daily activities."   (*Id.*).

---

[15]    Section 12 lists mental disorders in nine diagnostic categories.   20 CFR 404, subpart P, app. 1, § 12.00(A).   Section 12.02 applies to organic mental disorders, section 12.04 applies to affective disorders, and section 12.06 applies to anxiety-related disorders.   *Id.*

[16]    The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.

20 C.F.R. § 404, app. 1, 12.00(A).

[17]    The ALJ defined a marked limitation as "more than moderate but less than extreme." (Admin. R. at 14).

[18]    The ALJ defined extended duration as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."   (*Id.*).

[19]    The ALJ defined activities of daily living as including "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, appropriate grooming and hygiene, using telephones and directories, and using a post office." (*Id.*) (citing 20 CFR 404 Subpart P, App. 1 § 12.00(C)(1)).

Webb was moderately restricted in social functioning.[20]  (*Id.*).  Webb had a small group of close friends, talked with her brother every two weeks, attended a weekly cooking class, generally got along with authority figures, and went to the library every one to three days as long as it is not too busy or noisy.  (*Id.*).  Webb, however, avoided situations involving large groups, had difficulty spending time at other people's homes, and could get irritable and overwhelmed. (*Id.*).

Webb was moderately restricted in concentration, persistence, and pace.[21]  (*Id.*).  Webb did not need reminders to go places, self-reported an ability to concentrate for at least ten to fifteen minutes at a time, performed one- to two-step tasks although she had difficulty with some instructions, maintained a schedule with proper planning, had consistently been on time for medical appointments and consultative examinations, used a computer for about an hour a day, and had been taking a weekly cooking class.  (*Id.*).

Webb experienced no episodes of decompensation of extended duration according to the ALJ.[22]  (*Id.* at 15).   Dr. Olson concluded that Webb experienced three episodes of decompensation of extended duration, however, he did not describe these episodes—he only

---

[20]     The ALJ defined social functioning as "the claimant's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." (*Id.*) (citing 20 CFR 404, subpart P, app. 1, § 12.00(C)(2)).

[21]     The ALJ defined concentration, persistence, and pace as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  (*Id.*) (citing 20 CFR 404, subpart P, app. 1, § 12.00(C)(3)).

[22]     The ALJ defined an episode of decompensation as "an exacerbation or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  (*Id.* at 15) (citing 20 CFR 404, subpart P, app. 1, § 12.00(C)(4)).

The ALJ defined repeated episodes of decompensation each of extended duration as requiring that "the evidence . . . reflect three episodes of decompensation within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.").  (*Id.*).

noted they existed. (*Id.*).   Moreover, Webb was never hospitalized for her psychological symptoms, and no other evidence outside of Dr. Olson's opinion established episodes of decompensation.   (*Id.*).   The ALJ found that Webb consistently maintained her adaptive functioning despite her mental impairments. (*Id.*).

Thus, the ALJ found Webb's mental impairments did not satisfy the "Paragraph B" criteria.   (*Id.*).   The ALJ also found "Paragraph C" requirements were not met.[23]   (*Id.*).   To satisfy "Paragraph C" for either organic mental disorders or affective disorders:

> [T]here must be a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) [r]epeated episodes of decompensation, each of extended duration; or (2) [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) [c]urrent history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

(*Id.*).   Webb satisfied the threshold requirement because she had been diagnosed with affective disorder and a cognitive disorder for which she took prescription medicine and attended counseling. (*Id.* at 15–16).   The ALJ, however, determined that Webb did not satisfy the criteria

---

[23]   The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. . . .  Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.

20 C.F.R. § 404, subpart P, app. 1, § 12.00(A).

requiring repeated episodes of decompensation.  (*Id.* at 16).  The ALJ also found that Webb did

not satisfy the second or third criteria because she showed an ability to adapt to increased mental

demands in a changing environment, like her changing medical treatments, and has lived alone

and independently with no indication of needing a highly supportive living situation throughout

the alleged disability period.[24]  (*Id.*).

> The ALJ found Webb had the residual functional capacity ("RFC"),

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can handle exposure to noise intensity levels not above the moderate level as defined in the Selected Characteristics of Occupations[.]  She is limited to understanding, remembering and carrying out short simple instructions and interacting appropriately with coworkers and the general public on a brief and superficial basis.

(*Id.*).  The ALJ considered Webb's symptoms to the extent they were consistent with objective

evidence.  (*Id.*).  The ALJ applied the requisite two-step test for considering Webb's symptoms.

(*Id.* at 16–17).   First, the ALJ determined "whether there is an underlying medically

determinable physical or mental impairment(s) . . . that could reasonably be expected to produce

[Webb's] pain or other symptoms."  (*Id.* at 16).  Second, the ALJ evaluated "the intensity,

persistence, and limiting effects of [Webb's] symptoms to determine the extent to which they

limit [Webb's] functioning."  (*Id.* at 17).  When medical evidence did not substantiate statements

about the "intensity, persistence, or functionally limiting effects of pain or other symptoms[,]"

the ALJ determined the credibility of the statements based on the entire record.  (*Id.*).

Webb alleged the following symptoms because of her impairments: (1) changes in mood,

(2) impaired concentration, (3) impaired multitasking, (4) difficulty in initiating and completing

tasks, (5) increased irritability; (6) increased difficulty working with others; and (7) lack of a

---

[24]     To satisfy the "Paragraph C" requirements for anxiety-related disorders, the ALJ explained that "there must be a complete inability to function independently outside the area of one's home."  (Admin. R. at 16).

sensory gate causing her to get overwhelmed by visual and auditory stimuli.  (*Id.*).  The ALJ found Webb's impairments could reasonably be expected to cause the alleged symptoms, but that Webb's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (*Id.*).  The ALJ found that the record supported a decrease in Webb's cognitive functioning since her AOD, but not a finding of disability due to her cognitive difficulties.  (*Id.*).

Neuropsychological testing by Dr. Swenson showed that Webb had some mild to subtle difficulties with attention.  (*Id.*).  The ALJ concluded that Webb's mild to subtle difficulties were particularly evident to her given her work as a nurse, but they did not prevent her from unskilled work.  (*Id.*).  In addition, Dr. Swenson noted improvement in Webb, which he believed was correlated with her improved emotional functioning and fewer demands on her brain function after leaving her job as a nurse.  (*Id.*).  Before Webb's State Agency consultative examination in March 2011, Webb researched psychological assessments and talked to physicians about testing.  (*Id.* at 17–18).  The ALJ explicitly noted that the record established that Webb could no longer perform the highly skilled work she had in the past.  (*Id.* at 18).  The ALJ explained that she accepted Webb's allegations of an impaired sensory gate that limited her ability to deal with noise and included that limitation in her RFC determination.  (*Id.*).  The ALJ opined that Webb had the ability to perform work consistent with the RFC determination—evidenced by her ability to perform simple routine tasks—and  there is no evidence that doing such would exacerbate her cognitive problems.  (*Id.*).

The ALJ found that Webb's affective disorder and PTSD, for which she took prescribed medications and engaged in therapy, did not cause limitations beyond those included in the RFC.

(*Id.*).  Specifically concerning Webb's depression, the ALJ noted that it had been deemed fairly well managed as of the AOD, and by September 2010 her depression symptoms were the best they had been for some time.  (*Id.*).  Also, Webb's PTSD had been well-managed historically. (*Id.*).  The ALJ also considered Webb's GAF scores, which were in the 50s during her alleged disability period, reflecting only moderate symptoms or difficulty in social, occupational, or school functioning.  (*Id.*)  In sum, Webb's moderate symptoms did not suggest a disabling impairment.  (*Id.*).

Webb had an exceptional work history that lent her credibility and suggested high work motivation.  (*Id.*).  Much of Webb's testimony centered on her inability to perform her past skilled work as a nurse, which the ALJ agreed Webb could no longer perform but which, itself, does not render her disabled.  (*Id.*).  The ALJ, however, explained that the evidence showed that Webb could do work consistent with her RFC.  (*Id.*).

The ALJ also considered Webb's activities of daily living and concluded that they were consistent with the RFC.  (*Id.* at 18–19).  Webb lived independently, performed personal care without assistance, made simple meals, performed household chores, shopped, drove a car, managed her own money and bills, and attended appointments and leisure activities, like a weekly cooking class independently and weekly gardening.  (*Id.*).  Webb testified that task completion took longer, she had difficulty multi-tasking, and decreased attention to household chores, however, the ALJ concluded that these were "not indicative of an inability to engage in simple, routine tasks consistent with the RFC assessment."  (*Id.* at 19).  Acknowledging testimony that Webb had daytime napping and days when she stayed in bed, the ALJ found that the medical evidence did not support a medical necessity for increased napping or absenteeism

despite questions to the VE at the hearing concerning implications of increased absenteeism. (*Id.*).

The ALJ also considered, generally accepted, and provided some weight to the third-party statements of Webb's brother, her former co-worker, and her friend, which all detail Webb's decreased mental functioning. (*Id.*). The ALJ concluded, however, that the third-party statements did not rule out Webb's ability to perform simple routine tasks. (*Id.*).

The ALJ gave some weight to findings of the State Agency consultative examiner Dr. Ochsendorf. (*Id.*). The ALJ noted that Webb may have exaggerated the findings of her neuropsychological testing during her consultative examination—for example, Webb told Dr. Ochsendorf that her first neuropsychological testing resulted in moderate to significant attention and concentration deficits but the actual results were subtle to mild. (*Id.*). In addition, Webb told Dr. Ochsendorf that Dr. Swenson told her it was "unsafe for her to work as a nurse or in any environment due to her deficits[,]" but the ALJ found the record evidence suggested that Dr. Swenson only told Webb she should no longer work as a pediatric nurse. (*Id.*) (internal quotations omitted). Dr. Ochsendorf's testing resulted in a finding that Webb "can understand, remember and follow directions, sustain adequate attention and concentration, respond appropriately to brief and superficial contact and do well with job tasks that are routine." (*Id.*). The ALJ acknowledged that Dr. Ochsendorf only examined Webb once, but her findings were consistent with Webb's daily activities, her GAF scores, and the objective medical evidence. (*Id.*).

The ALJ afforded some weight to the opinions of State Agency psychological consultants Drs. Johnson and Conroe. (*Id.*). Drs. Johnson and Conroe opined that Webb:

> can understand, remember[,] and carry out unskilled tasks, handle brief and
> superficial contact with co-workers and the public, attend to tasks for sufficient

periods of time to complete them[,] and tolerate and respond to both ordinary levels of supervision found in a customary work setting and routine stresses of a routine, repetitive work setting.

(*Id.*).   The ALJ concluded that Dr. Johnson's and Dr. Conroe's opinions were consistent with the objective medical evidence, Webb's GAF scores, and Webb's activities of daily living.  (*Id.*).

The ALJ provided some weight to a MSS completed by Dr. Swenson.  (*Id.* at 20).  In the MSS, Dr. Swenson, opined that Webb "has no limitations in understanding, remembering[,] and carrying out simple instructions[,]" and that Webb:

> is only mildly limited in her ability to make judgments on simple work-related decisions, moderately limited in her ability to interact appropriately with supervisors, co-workers and the general public[,] and moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting.

(*Id.*).  The ALJ determined that the MSS was consistent with Webb's GAF scores and her activities of daily living.  (*Id.*).

The ALJ provided little weight to Dr. Swenson's PRT.  (*Id.*).  In the PRT, Dr. Swenson concluded that Webb met or equaled a Listing under 12.02, which applies to organic mental disorders.  (*Id.* at 20, 502).  The ALJ, however, noted that the results of Dr. Swenson's objective testing of Webb did not support this conclusion because the evidence did not show that Webb would have difficulty with attention in simple routine work; rather, the results show that Webb's difficulties with attention are more pronounced in a stressful and demanding environment.  (*Id.* at 20).  The ALJ also noted that Webb had a full scale IQ of 100, her neuropsychological testing was only mildly abnormal, and her cognitive deficits are mild to subtle, which are inconsistent with having an impairment that equals a Listing.  (*Id.*).  The ALJ also found that the PRT was inconsistent with the MSS and was not supported by Dr. Swenson's findings concerning Webb's "Paragraph B" criteria.  (*Id.*).  The ALJ noted that even though Dr. Swenson concluded in his

PRT that Webb's condition met a Listing, his inclusion of only marked limitations in concentration, persistence, and pace were insufficient to establish a Listing. (*Id.*). The ALJ later stated that Dr. Swenson's opinion that Webb has marked limitations in concentration, persistence, and pace was inconsistent with Dr. Swenson's opinion in the MSS that Webb has no limitations in performing simple instructions and with Dr. Swenson's treatment notes and Webb's GAF scores. (*Id.*). The ALJ also explained that the PRT does not support the contention that Webb has Listing-level limitations at the present time because the PRT was for the period from February 8, 2010, to September 29, 2010. (*Id.*).

The ALJ considered the opinions of Dr. Olson, including a MSS and a PRT he prepared. (*Id.* at 20–21). The ALJ gave Dr. Olson's PRT and his opinion that Webb could not engage in competitive employment little weight and gave his MSS and other opinions in his treatment notes some weight. (*Id.* at 21). Concerning Dr. Olson's PRT and his opinion that Webb could not engage in competitive employment, the ALJ concluded that both were inconsistent with Dr. Olson's own treatment notes, the objective medical evidence, and Webb's GAF scores. (*Id.*). In the PRT, Dr. Olson opined that Webb met a Listing under 12.02 due to her "marked limitations in concentration, persistence and pace and three episodes of decompensation, each of an extended duration." (*Id.* at 20–21). The ALJ noted that the record provided no evidence of any episodes of decompensation of extended duration. (*Id.* at 21). In addition, the ALJ explained that Dr. Olson's PRT was inconsistent with his MSS, where Dr. Olson opined that Webb was "only mildly limited in her ability to understand, remember[,] and carry out simple instructions, mildly limited in her ability to interact appropriately with the public[,] and moderately limited in her ability to interact with supervisors and co-workers." (*Id.*). The ALJ concluded that Dr. Olson's statements that Webb was "markedly limited in her ability to [make] judgments on

simple work related decisions and markedly limited in her ability to respond to usual work situations and to changes in a routine work setting" were inconsistent with Dr. Olson's otherwise mild findings relating to simple work, his findings during two separate neuropsychological examinations, and his treatment notes. (*Id.*).

The ALJ found that Dr. Olson's MSS provided support for her RFC determination because even moderate limitations as defined in the MSS showed that Webb can function satisfactorily. (*Id.*). Dr. Olson's opinions in various treatment notes that Webb was unable to work were interpreted to apply to Webb's past work as a nurse because these opinions were rendered in relation to applications for short- and long-term disability were given some weight because the ALJ agreed Webb could no longer work as a nurse. (*Id.*).

The ALJ considered the opinions of the State Agency medical consultants Drs. Grant and Salmi and afforded them heightened weight. (*Id.*). Both Drs. Grant and Salmi opined that Webb did not have any severe physical impairments. (*Id.*). There was no record or testimonial evidence of any physical impairments. (*Id.*).

At step four, the ALJ determined that Webb was incapable of performing any past relevant work because the demands of the job surpassed her RFC. (*Id.*).

At step five, given Webb's age as an individual closely approaching advanced age at the AOD, her education, her work experience, and her RFC, the ALJ found jobs in significant numbers existed in the national economy that Webb could perform. (*Id.* at 22). The ALJ relied on the VE's testimony—which was consistent with the DOT—that an individual with Webb's limitations could work as a hand packager, kitchen helper, or a janitor/cleaner, all of which are unskilled. (*Id.* at 22–23). The ALJ found Webb was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 23).

### G.        Responses to the ALJ's Decision By Drs. Olson and Swenson

Webb submitted to the Appeals Council, Dr. Olson's and Dr. Swenson's supplemental responses to interrogatories, posed by Webb's attorney, concerning the ALJ's decision; those supplemental responses are now part of the record.  (*Id.* at 1–5, 517–23, 526–29).

### 1.        Dr. Olson's Supplemental Responses

Dr. Olson believed the record established the requisite episodes of decompensation, because "[o]ver the past two and a half years[,] there have been severe episodes of worsening anxiety and depression, leading to changes of psychotropic medications.  [Webb] ha[d] consistently struggled with cognitive [issues] throughout this time, including problems of concentration, focus, [and] being easily overwhelmed and unable to multitask." (*Id.* at 517).  Dr. Olson opined that his MSS was not inconsistent with his PRT because the PRT was a "more global" assessment.  (*Id.* at 518).

Webb asked Dr. Olson whether his assessment that Webb had a marked limitation in her ability to respond to usual work situations and changes in the work environment was inconsistent with his assessment that Webb could understand, remember, and carry out simple instructions. (*Id.*).  Dr. Olson responded that he did not think the two were inconsistent because he believed that he "[had] described in [his] notes [Webb's] ongoing cognitive problems.  [Webb's] mood and anxiety symptoms have fluctuated but cognition problems continued." (*Id.*).

Webb then asked Dr. Olson whether his assessment that Webb was markedly limited in her ability to respond to typical work situations and changes in that setting was irreconcilable with Dr. Swenson's opinion that Webb's deficits would typically be noticeable in high demand situations involving complex processing; not in simple, routine work.  (*Id.* at 519).  Dr. Olson

responded "No, high demand would make [the deficits] more apparent but I believe she struggles in all settings." (*Id.*).

Concerning the ALJ's use of Webb's GAF scores, Dr. Olson explained, "GAF should not be used for determining disability. The medical and cognitive components are not factored into the GAF as heavily as mood/anxiety. [Webb's] cognitive problems are her primary obstacle to competitive employment, not her mood or anxiety." (*Id.*).

Dr. Olson stated that his "notes . . . describe[d Webb's] problems of cognition—of concentration, focus, multitasking etc." and therefore were not inconsistent with his conclusion that Webb could not work. (*Id.*). Dr. Olson stated "Dr. Swenson provided objective neuropsychological testing data that was consistent with my clinical opinion that [Webb] would not be able to engage in competitive employment[;]" therefore, he did not agree with the ALJ's statement that his conclusion that Webb could not engage in competitive employment was inconsistent with the objective medical evidence. (*Id.* at 520).

Dr. Olson did not think the ALJ's decision was supported by the medical evidence. (*Id.*). Also, the ALJ's "use of GAF scores" was an example of the ALJ making her own inferences from the medical reports according to Dr. Olson. (*Id.*). Dr. Olson also responded that the differences in the PRT and MSS forms between Drs. Olson and Swenson did not mean that one was faulty and did not make him believe he needed to change his assessment. (*Id.* at 521). Dr. Olson opined Webb's testimony was consistent with a person suffering cognitive side effects of chemotherapy and with the facts developed during his care of Webb. (*Id.* at 521–22). Finally, Dr. Olson wrote "I believe Webb is disabled and unable to work due to the cognitive problems she is suffering from." (*Id.* at 522).

### 2. Dr. Swenson's Supplemental Responses

Dr. Swenson explained that it is not unusual—and was actually commonplace—for treating physicians with different specializations to provide different severity of limitations assessments for the same patient. (*Id.* at 526). Dr. Swenson further explained, "[t]he environmental demands placed on . . . Webb's brain function are different in a brief office visit versus a comprehensive neuropsychological exam. The latter is designed to provide a more real-world scenario . . . ." (*Id.*). In addition, Dr. Swenson explained that Dr. Olson's and his different severity ratings did not mean that either opinion was faulty because "the specific rating of severity applied to constructs of a limitation will be a function of the information each doctor has." (*Id.*). Dr. Swenson explained that the different ratings of Webb's ability to respond appropriately to work situations and changes in work setting could be caused by the different contexts in which Webb was examined. (*Id.* at 526–27). Dr. Swenson clarified, "Clearly, the intensity of Dr. Olson's and my experience with [Webb's] psychiatric and neuropsychological presentation is going to be much higher than say, a visit to her [primary care physician] for a cold or cough. Again, . . . [Webb's] impairments only become evident when she is in an environment . . . which demands injured parts of her brain to function . . . ." (*Id.* at 527).

Dr. Swenson was provided a copy of Dr. Olson's MSS and PRT and asked whether he believed they were inconsistent with the facts of Webb's case, to which Dr. Swenson responded that he believed Dr. Olson's assessments were an "objective reflection of his psychiatric observations and are consistent with the facts of . . . Webb's case." (*Id.*). Dr. Swenson reported that he did not have any objections to Dr. Olson's assessments of Webb. (*Id.*).

Finally, Dr. Swenson provided a statement about the ALJ's decision:

The ALJ's reasoning that Webb should still be able to perform unskilled work involving simple routine and repetitive task provided her contact with public and

coworkers was brief and superficial **lacks proper medical foundation**. The injuries to . . . Webb's brain do not impact her knowledge of intelligence levels—they affect her performance capabilities under certain demands of the environment. The ALJ makes an assumption that a highly trained professional will be fine working in a setting that requires less knowledge (despite less knowledge being required[,] she still will struggle with attention, fatigue, over stimulation by noise and light, and multi-tasking) and worse yet[,] is a constant reminder to her of what she has lost since her acquired brain injury from chemotherapy insult. There is no health benefit to expose patients to situations they still might struggle in and that are also psychologically defeating to simply allow the ALJ to deny her claim. It is not my, and I believe I can say Dr. Olson's, practice to harm patients, particularly when someone not properly trained makes an assumption not based on sound medical practice and experience, that it will be alright to place someone in an inappropriate environment when they lack the medical/neuropsychological training to make such vocational recommendations.

(*Id.* at 528–29) (emphasis in original).

## II.    STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992) (citing 42 U.S.C. § 1382(a)). "Disability" under the Social Security Act (the "SSA") is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

## A.      Administrative Record

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review.  *Id.* §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic.  *Id.* §§ 404.967–.982, 416.1467.  If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court.  42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.  An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action.  *Id.*

## B.      Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. § 405(g).  The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'"  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence."  *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet the reviewing court must "consider evidence that detracts from the Commissioner's decision as

well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).  Thus, a

"notable difference exists between 'substantial evidence' and 'substantial evidence on the record

as a whole.'"  *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis.  In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, the Court analyzes the following factors:  (1) the ALJ's

findings regarding credibility; (2) the claimant's education, background, work history, and age;

(3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the

claimant's subjective complaints of pain and description of physical activity and impairment; (5)

third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony

based on proper hypothetical questions that fairly set forth the claimant's impairments.  *Brand v.

Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).  Proof of

disability is the claimant's burden.  20 C.F.R. § 404.1512(a).  Thus, "[t]he burden of persuasion

to prove disability and to demonstrate [residual functional capability] remains on the claimant,

even when the burden of production shifts to the Commissioner at step five."  *Stormo v.

Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the

opposite conclusion."  *Hensley*, 352 F.3d at 355.  If substantial evidence on the record as a whole

permits one to draw two inconsistent positions and one of those represents the Commissioner's

findings, then the Commissioner's decision must be affirmed.  *Pearsall v. Massanari*, 274 F.3d

1211, 1217 (8th Cir. 2001).  The Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently."  *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

There is a special standard of review addressing situations where, as here, the Appeals Council considered new evidence but declined review:

> When the Appeals Council has considered material new evidence and nonetheless declined review, the ALJ's decision becomes the final action of the Secretary. We then have no jurisdiction to review the Appeals Council['s] action because it is a nonfinal agency action. *See Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  At this point, our task is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ. As we have noted, "this [is] a peculiar task for a reviewing court." *Rilely v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  Some circuits simply refuse to consider such tardy evidence as a basis for finding reversible error. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir.1994); *Cotton v. Sullivan*, 2 F.3d 692, 695–96 (6th Cir.1993). But we [the Eighth Circuit] do include such evidence in the substantial evidence equation.

*Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995).

## III.   DISCUSSION

Webb alleges that the ALJ erred in multiple ways in calculating Webb's RFC and in reaching her ultimate decision.  First, Webb argues that the ALJ failed to accord proper weight to her treating physicians' opinions.  (Webb's Mem. in Supp. of Mot. for Summ. J. "Webb's Mem. in Supp.") [Doc. No. 11 at 17–25].  Second, she argues the ALJ failed to follow applicable rulings requiring Webb's treating physicians be recontacted.  (*Id.* at 25–26).  Third, Webb argues that the ALJ inappropriately relied upon Webb's GAF scores.  (*Id.* at 26–29).  Fourth, Webb argues the ALJ's credibility determination was not supported by substantial evidence in the record as a whole.  (*Id.* at 29–33).  Fifth, Webb alleges problems with the VE's testimony.  (*Id.* at

33–34).   Thus, Webb argues the ALJ's decision was not supported by substantial evidence in the record as a whole.   (*Id.* at 33–35).   The Court considers Webb's arguments below, but finds the ALJ's RFC and ultimate decision based on substantial evidence in the record as a whole.

### A.      Treating Physician Opinions in RFC Determination

The ALJ accorded the following weight to the opinions of Webb's treating physicians (Drs. Olson and Swenson): little weight to Dr. Swenson's PRT; some weight to Dr. Swenson's MSS; little weight to Dr. Olson's PRT and his opinion that Webb could not engage in competitive employment; and some weight to Dr. Olson's MSS and his opinion that Webb cannot work as a nurse.   (Admin. R. at 20–21).   The ALJ also afforded some weight to Dr. Ochsendorf's opinion and State Agency psychological consultants Drs. Johnson and Conroe's opinions and heightened weight to the opinions of State Agency medical consultants Drs. Grant and Salmi concerning Webb's lack of severe physical impairments.   (*Id.* at 19–21).

Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding.[25]   20 C.F.R. § 404.1527(c)(2).   In fact, when supported by proper medical testing, and not inconsistent with other substantial evidence on record, the ALJ must give such opinion controlling weight.   *Id.*   "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."   *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citation and internal quotation omitted).   "The ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise."   *Ahlstrom*, 2010 WL 147880, at *23.   "[O]pinions of treating physicians, on questions reserved

---

[25]      The parties do not contest the fact that Drs. Swenson and Olson were Webb's treating physicians.

for the Commissioner—such as whether a claimant is disabled, or is unable to work—are not to be given any weight by the ALJ.  *Id.* (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)).

After the hearing and the decision by the ALJ, Webb submitted responses to interrogatories from Drs. Olson and Swenson; the Appeals Council considered the evidence, but declined review.  (Admin. R. at 1–5).  Under these circumstances, the Court must determine whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence considered by the Appeals Council that was not before the ALJ. *Mackey*, 47 F.3d at 953.  Webb raises multiple arguments in opposition to the weight the ALJ accorded to the treating physician opinions that implicate evidence from the interrogatories submitted to the Appeals Council but not before the ALJ.  Based on Webb's arguments, discussed below, the Court concludes that despite this additional evidence, the ALJ's decision was supported by substantial evidence.

### 1. Dr. Olson's PRT Opinion Concerning Episodes of Decompensation

Webb argues that the requisite episodes of decompensation of extended duration can be inferred from at least four changes in her psychotropic medications.  (Webb's Mem. in Supp. at 20).

Episodes of decompensation are:

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  **Episodes of decompensation may be inferred from medical records showing significant alteration in medication**; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

41

The term repeated episodes of decompensation, each of extended duration in these [L]istings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. § 404 App. 1, 12.00C(4) (emphasis added).

When considering Dr. Olson's determination that Webb experienced three episodes of decompensation of extended duration, the ALJ noted that Dr. Olson did not "identify or otherwise describe the episodes of decompensation."  (Admin. R. at 15).  In fact, Dr. Olson merely checked a box labeled "[t]hree" to indicate the number of episodes of decompensation of extended duration that Webb experienced.  *See* (*id.* at 421).  The ALJ explained that the record provided no instances of hospitalization for Webb's psychological symptoms and no other evidence of decompensation as Webb had "consistently maintained her adaptive functioning despite her mental impairments."  (*Id.* at 15).  Thus, the ALJ concluded that Webb had not experienced any episodes of decompensation of extended duration.  (*Id.*).

In Dr. Olson's response to interrogatories, he stated that he did not agree with the ALJ's decision that the record contained no evidence of the requisite episodes of decompensation of extended duration by saying "over the past two and a half years there have been severe episodes of worsening anxiety and depression, leading to changes of psychotropic medications.  She has consistently struggled with cognitive [issues] throughout this time, including problems of concentration, focus, being easily overwhelmed or unable to multitask."  (*Id.* at 517).  Dr. Olson did not, however, provide any explicit occasions of medication changes that met the requirements for an episode of decompensation of extended duration.  *See* (*id.*).

Webb lists the following medication changes as establishing episodes of decompensation:

42

On July 13, 2010, Dr. Olson prescribed Aricept for Webb for worsening symptoms. On October 7, 2010, Dr. Olson added Wellbutrin to Webb's regime as an augmenting antidepressant. On February 21, 2011, Olson prescribed a low dose of Lamictal. The Lamictal was stopped and Citalopram was added as an antidepressant when Webb reported increases in anxiety and thoughts of wishing she were dead.

(Webb's Mem. in Supp. at 20–21) (internal citations omitted).

On July 13, 2010, when Dr. Olson prescribed Aricept for Webb, there was no indication

that her symptoms were worsening. (Admin. R. at 335–36). In his notes, Dr. Olson wrote:

[Webb] feels her mood is okay. Struggles with apathy but not severe depression of the past. [Webb] struggles to focus. [Webb] has been a reader in the past but now has less enjoyment with previously enjoyed authors. It is hard for [Webb] to concentrate to read finding herself shifting back and forth.

[Webb] struggles with her concentration and focus finding herself obsessing on details and inability to shift tasks or multitask.

(*Id.* at 335). Dr. Olson noted that Webb remained unable to work and he prescribed her Aricept

to "try to target the cognitive difficulties." (*Id.* at 336). Because of the lack of evidence that

Aricept was prescribed to deal with exacerbations in Webb's condition or any increase in

symptoms causing a lack of adaptive functioning, the Court does not believe it is the type of

change in medication that allows an inference of an episode of decompensation. *See* 20 C.F.R. §

404, App. 1, 12.00C(4).

On October 7, 2010, when Dr. Olson added Wellbutrin, there was again no indication of

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive

functioning.[26] (*Id.* at 316). In his visit notes, Dr. Olson wrote:

---

[26] Wellbutrin is the brand name for bupropion, which "is used to treat depression. It is also used as part of a support program to help people stop smoking. This medicine may be used to prevent depression in patients with seasonal affective disorder (SAD), which is sometimes called winter depression." *Bupropion (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/DRG-20062478.

> In recent times [Webb] was reevaluated by Dr. Swenson for neuropsychology reassessment. I do not have a formal record yet but I did confer with him by phone briefly yesterday. He reported that there were some areas of some improvement but considerable persisting problems of concentration, attention, and focus, particularly in the area of multitasking and he felt that she would continue to be unable to return to work as a nurse because of [these] cognitive difficulties.
>
> [Webb] has been struggling with apathy. [Webb] continues to struggle in multitask situations, often feels overstimulated, and continues to notice that she is oversensitive to sounds and has concentration troubles . . . .
>
> [Webb] poorly tolerated [the] Aricept trial. We had considered options such as Namenda but another alternative may be Wellbutrin focusing on concentration and mood. She does report her Beck Depression Inventory score had been improving when seen in Dr. Swenson's office.

(*Id.*). Dr. Olson then stated that he would "try to augment the Effexor with Wellbutrin targeting both mood and concentration and attention. We will utilize lowest dose possible . . . ." (*Id.* at 317). Again, there is a lack of evidence that Wellbutrin was prescribed to deal with exacerbations in Webb's condition or any increase in symptoms causing a lack of adaptive functioning, and the Court does not believe it is the type of change in medication that allows an inference of an episode of decompensation. *See* 20 C.F.R. § 404, App. 1, 12.00C(4).

On February 21, 2011, Dr. Olson prescribed a low dose of Lamictal, but again there was no accompanying indication of the required exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning as required to establish episodes of decompensation. (*Id.* at 406–07). Dr. Olson explained in his notes:

> There was some increase in impulsive behavior of shopping initially on the Requip but this seems to have backed off. We gradually tapered the Effexor with phone contact. [Webb] is struggling with irritability, had some discontinuation syndrome symptoms although these are backing off.
>
> She felt too pressured from the Effexor, [and had a] restless feeling that she had to move about, and [felt] more anxious. The SAD Light also seemed to over energized her and she has stopped this in recent times.

Since working down the Effexor she feels her anxiety is somewhat less[,] although irritability and moodiness have been difficult.   Concentration and focus remain a struggle.[27]

(*Id.* at 406).   Dr. Olson then prescribed a low dose of Lamictal for mood stabilization.   (*Id.* at 407).   Again, there is a lack of evidence that the Lamictal was prescribed to deal with exacerbations in Webb's condition or any increase in symptoms causing a lack of adaptive functioning, and the Court does not believe it is the type of change in medication that allows an inference of an episode of decompensation.   *See* 20 C.F.R. § 404, App. 1, 12.00C(4).

Finally, on May 23, 2011, Webb saw Dr. Olson and complained that she was not tolerating the Lamictal.   (*Id.* at 488).   At this visit, Dr. Olson explained:

Since last seen she has been struggling with more depression that led to restarting a trial of Lamictal[,] initially[,] one[-]fourth tablet of the 25 mg.   This did seem to help her mood[,] however[,] anxiety was slightly worse, when the Lamictal was increased to 12.5 mg per day she reports dramatic increase in anxiety, palpitations, shortness of breath that have not been tolerable.   This increase occurred on May 19. . . .  She has been struggling with depression, anxiety.

Her ongoing areas of struggle include feeling sensory . . .  overloaded, distractible.   She struggles to initiate things.   She has been struggling with worried thoughts, anxiousness, feeling overwhelmed . . . .   She is much more irritable and struggles with decision-making.

(*Id.* at 488).   Webb was prescribed Celexa.   (*Id.* at 490).   Even though Webb had been experiencing more depression and anxiety, there was no noted increase in her cognitive problems.   (*Id.* at 488–90).   In addition, there was no indication that these increased symptoms caused a loss of adaptive functioning as required.   *See* 20 C.F.R. § 404, App. 1, 12.00C(4).

The Court does not find that the medication changes listed by Webb allow an inference of an episode of decompensation.   To adopt Webb's argument would be to read "changes in

---

[27]     Requip was prescribed to Webb for sleep problems.   *See* (Admin. R. at 314–15, 404–05). Because Webb's sleep problems are not a condition that form the basis of her claim, medical records pertaining to this condition have not been summarized.

medication" in isolation from the rest of the episode of decompensation definition. *See* 20 C.F.R. § 404, App. 1, 12.00C(4). Thus, even considering Dr. Olson's responses to interrogatories after the ALJ's decision, there is still substantial evidence in the record as a whole to support the ALJ's decision that there was no evidence establishing the requisite three episodes of decompensation of extended duration.

### 2.      Other Opinions of Drs. Olson and Swenson Afforded Little Weight

The ALJ afforded little weight to Dr. Swenson's PRT because it was inconsistent and unsupported. (*Id.* at 20). The ALJ stated that Dr. Swenson's opinion that Webb had marked limitations in concentration, persistence, and pace was inconsistent with Dr. Swenson's opinion in the MSS that Webb had no limitations in performing simple instructions, with Dr. Swenson's treatment notes, and Webb's GAF scores. (*Id.*). The ALJ also explained that the PRT did not support Webb's contention that she currently met a Listing because the PRT was for the period from February 8, 2010, to September 29, 2010. (*Id.*).

The ALJ gave Dr. Olson's PRT and his opinion that Webb could not engage in competitive employment little weight and gave his MSS and other opinions in his treatment notes some weight. (*Id.* at 21).

Webb argues the ALJ relied on Webb's GAF scores to devalue Dr. Olson's opinions and to "downgrade Dr. Swenson's opinion. . . . " (Webb's Mem. in Supp. at 21–22). Webb also argues that the supplemental responses of Drs. Olson and Swenson show that:

> [the ALJ] thought she had a claimant with only mild or moderate symptoms who could surely work at some less stressful job than being a nurse[;] . . . a premise built on a misreading and misevaluation of the evidence.

(*Id.* at 35). In addition, Webb argues that Dr. Olson's supplemental responses illuminate that the GAF scores "factor in mood and anxiety more heavily than medical and cognitive

46

components[,]" which Webb argues shows that the ALJ improperly used Webb's GAF scores in her analysis.  (*Id.* at 34).

In his supplemental responses, Dr. Olson tried to explain away many of the inconsistencies cited by the ALJ, as outlined above.  Despite Dr. Olson's explanations, the Court finds substantial evidence in the record as a whole supports the ALJ's decision.  First, Dr. Olson's description of the PRT and MSS as different types of assessment does not mean the two could not be compared, especially in the ALJ's overall decision to provide little weight to Dr. Olson's PRT.  Second, although Dr. Olson explained that he believed Webb struggled in all environments, Dr. Swenson opined Webb's difficulties would be **particularly** apparent in high stress, complex processing environments.  Finally, the Court agrees with the Commissioner that, as a piece of evidence in the record, the ALJ was allowed to consider GAF scores, because Webb applied for benefits based in part on her anxiety/mood problems.  Thus, considering GAF scores in addition to evidence concerning Webb's cognitive problems does not diminish the ALJ's decision.

Dr. Swenson also explained the inconsistencies between how he and Dr. Olson assessed Webb's limitations differently.  Dr. Swenson explained that the different environments between an office visit and neurological testing explain the discrepancies and he interpreted "marked" limitations as disabling.  (Admin. R. at 526–27).

Moreover, Dr. Swenson stated in response to interrogatories posed by Webb after the ALJ's decision that:

> The ALJ makes an assumption that a highly trained professional will be fine working in a setting that requires less knowledge (despite less knowledge being required[,] she still will struggle with attention, fatigue, over stimulation by noise and light, and multi-tasking) and worse yet[,] is a constant reminder to her of what she has lost since her acquired brain injury from chemotherapy insult.  There is no health benefit to expose patients to situations they still might struggle in and that

> are also psychologically defeating to simply allow the ALJ to deny her claim. It is not my, and I believe I can say Dr. Olson's, practice to harm patients, particularly when someone not properly trained makes an assumption not based on sound medical practice and experience, that it will be alright to place someone in an inappropriate environment when they lack the medical/neuropsychological training to make such vocational recommendations.

(*Id.* at 528–29). Dr. Swenson's statements largely amount to determinations of Webb's disability and her ability to work, both of which are issues reserved to the Commissioner. *See Ahlstrom*, 2010 WL 147880, at *23 (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)). Therefore, the ALJ would not have to afford any weight to these explanations had they been before her. *Id.*

Overall, the Court does not find the supplemental responses of Drs. Olson and Swenson sufficient to change the ALJ's RFC determination.

### 3.      State Agency Examiner and Consultants

Webb argues that Dr. Ochsendorf's opinion is "couched in uncertainty[,]" and was afforded some weight because it was consistent with the GAF scores. (Webb's Mem. in Supp. at 24). The ALJ explained that "Dr. Ochsendorf's objective testing resulted in a finding that the claimant can understand, remember[,] and follow directions, sustain adequate attention and concentration, respond appropriately to brief and superficial contact[,] and do well with job tasks that are routine." (Admin. R. at 19). The ALJ also expressly noted that even though Dr. Ochsendorf only examined Webb once, her findings were given some weight because they were "consistent with the objective medical evidence, the claimant's GAF scores and her daily activities." (*Id.*). The ALJ, thus, appropriately determined to afford some weight to Dr. Ochsendorf's opinion as she found it consistent with other evidence. *See* 20 C.F.R. § 404.1527(c), (e) (listing the factors used in considering medical opinions as including: the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors).

As to Drs. Johnson and Conroe, Webb argues that much of the important medical evidence was not available to them as they issued their opinions on March 22, 2011, and May 12, 2011, respectively.[28] (Webb's Mem. in Supp. at 24). The ALJ provided their opinions some weight as she found them consistent with the objective evidence, Webb's GAF scores, and her daily activities. (Admin. R. at 19). Drs. Johnson and Conroe based their opinions concerning Webb's abilities on evidence in the record when they rendered their opinions. (*Id.*). Drs. Johnson and Conroe reviewed a limited record that included Dr. Ochsendorf's opinion and many of the treatment notes in the record. *See* (Admin. R.). The PRTs and MSSs, Drs. Swenson and Olson's responses to the ALJ's decision, and some treatment notes were not in the limited record. *See* (*id.*). There are relevant treatment notes that arose after Drs. Johnson and Conroe issued their opinions these notes, however, show no significant changes in Webb's condition.

Specifically, Webb highlights that Dr. Olson's PRT and MSS were not available to Drs. Johnson and Conroe; this evidence nonetheless does not show any significant changes in the objective medical evidence. In addition, as the ALJ explained, Drs. Johnson and Conroe's opinions were consistent with the objective evidence. (*Id.* at 19). The Court, thus, finds substantial evidence supports the ALJ's finding that the opinions of Drs. Johnson and Conroe were entitled to some weight. *See Claussen v. Astrue*, No. 10-CV-4258 (JNE/FLN), 2011 WL 6987174, at *11 (D. Minn. Dec. 20, 2011) *report and recommendation adopted*, 2012 WL 87534 (Jan. 11, 2012) (holding that the opinion of a State Agency physician based on a limited record is entitled to some probative weight when "the limited record reviewed was not substantially different from the other medical evidence available, and his findings were consistent with the weight of the objective medical evidence."). Therefore, the Court rejects Webb's argument that

---

[28] Webb argues that important evidence such as Dr. Olson's March 12, 2012 assessment was unavailable to Drs. Johnson and Conroe. (Webb's Mem. in Supp. at 24 n.6).

Dr. Oschendorf, Dr. Johnson, and Dr. Conroe, non-treating physicians, should not have been assigned weight equal to Drs. Olson and Swenson.  (Webb's Mem. in Supp. at 23–24).

### B.      Failure to Recontact Treating Physicians

Webb argues that the ALJ is not allowed to assign a certain amount of weight to a treating source's opinion without fulfilling the requirement of recontacting the treating sources. [29]  (*Id.* at 25–26); (Webb's Reply Mem. in Supp. of Mot. for Summ. J., "Webb's Reply") [Doc. No. 14 at 5–6].  Webb contends that SSR 96-5P "provides an affirmative duty for an ALJ to re-contact a source for clarification of an opinion when she cannot ascertain the basis for the opinion from the case record."  (Webb's Reply at 5).

SSR 96-5P concerns medical source opinions on issues reserved to the Commissioner and provides:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR 96-5P, 1996 WL 374183 (July 2, 1996).  The Eighth Circuit has clarified "[t]he ALJ is required to recontact medical sources and may order consultative evaluations **only if** the available evidence does not provide an adequate basis for determining the merits of the disability claim."  *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (emphasis added).  "While the ALJ has an independent duty to develop the record on a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'"  *Anderson v. Astrue*, No. 09-CV-2091 (JRT/SRN), 2010 WL

---

[29]      Webb contends that had the ALJ contacted Drs. Olson and Swenson, they would have provided the same information that they did in their supplemental responses.  As outlined above, the Court finds that this supplemental information was insufficient to render the ALJ's decision unsupported by substantial evidence on the record as a whole.

2735721, at *25 (D. Minn. June 15, 2010) *report and recommendation adopted*, 2010 WL

2732902 (July 9, 2010) (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

Here, the ALJ did not err in failing to recontact Webb's treating sources.  Webb argues

that "the ALJ said she could not find evidence to support the doctors' opinions in the medical

records."  (Webb's Mem. in Supp. at 25).  The ALJ provided little weight to Dr. Swenson's PRT

and Dr. Olson's PRT and provided some weight to Dr. Olson's MSS and treatment notes that

Webb was unable to work.  (Admin. R. at 20–21).  The ALJ made her decision to provide little

weight to Dr. Swenson's and Dr. Olson's PRTs because they were inconsistent with other

evidence in the record, which the ALJ explained in detail.[30]    *See* (*id.*).    Under such

circumstances, where the opinions of treating physicians are discounted, or afforded little weight

or some weight, as was the case here, SSR 96-5P does not require the ALJ to recontact the

treating physicians.   *See Anderson*, 2010 WL 2735721, at *25 ("The ALJ discounted Dr.

Douglass's opinions because they were inconsistent with other evidence in the record and under

such circumstances, **the regulations do not require the ALJ to recontact the physician**.

Additionally, the ALJ did not find the doctor's records inadequate, unclear, or incomplete, nor

did he find the doctor used unacceptable clinical and laboratory techniques. Instead, the ALJ

discounted the opinions because they were inconsistent with objective and other substantial

---

[30]     Webb contends that the ALJ is not allowed to afford some weight to the opinion of
treating sources that the ALJ did not find evidence for in the record without contacting the
treating sources.  (Webb's Mem. In Supp. at 25).  However, when the ALJ provided "some
weight" to Dr. Olson's treatment notes and MSS, she did not find those opinions to be
inconsistent with record evidence.  (Admin R. at 20–21).  In fact, the ALJ found the MSS
supported her RFC determination and agreed with treatment notes that Webb was unable to work
because they were made in connection with Webb's work as a nurse.  (*Id.* at 21).  These two
sources, thus, are not subject to the recontacting requirements of SSR 96-5P, which requires
recontacting when "evidence does not support a treating source's opinion on any issue reserved
to the Commissioner . . . ."  SSR 96-5P, at *6.

evidence.   Accordingly,  the  ALJ  was  under  no  obligation  to  recontact  the  treating  physician

under such circumstances.") (emphasis added).

> ### C.      ALJ Making Own Medical Opinion

Webb  argues  because  the  ALJ  gave  no  more  than  "some  weight"  to  each  physician's

opinion  in  the  record  the  ALJ  actually  developed  and  relied  on  her  own  medical  opinion.

(Webb's Mem. in Supp. at 19).

Applicable  regulations  provide  the  ALJ  "will  evaluate  every  medical  opinion  we  receive.

Unless  we  give  a  treating  source's  opinion  controlling  weight  under  paragraph  (c)(2)  of  this

section,  we  consider  all  of  the  following  factors  in  deciding  the  weight  we  give  to  any  medical

opinion."   20  C.F.R.  404.1527(c).  Those  factors  include:  examining  relationship,  treatment

relationship, supportability, consistency, and specialization.[31]  *See id.*

A  review  of  the  ALJ's  decision  shows  that  she  considered  evidence  in  the  record  in

making  her  RFC  determination  and  did  not  substitute  her  own  opinion  as  Webb  contends.   The

ALJ  considered  the  following  medical  evidence  in  making  her  RFC  determination:  (1)  the

findings  of  State  Agency  consultative  examiner  Dr.  Ochsendorf,  which  was  afforded  some

weight;  (2)  State  Agency  psychological  consultants  Drs.  Johnson  and  Conroe,  which  were

afforded  some  weight;  (3)  Dr.  Swenson's  MSS,  which  was  given  some  weight;  (4)  Dr.

Swenson's  PRT,  which  was  given  little  weight;  (5)  Dr.  Olson's  PRT  and  opinion  that  Webb

cannot  engage  in  competitive  employment,  which  was  given  little  weight;  (6)  Dr.  Olson's  MSS,

which  was  afforded  some  weight;  (7)  Dr.  Olson's  treatment  notes  that  Webb  was  unable  to  work

as  a  nurse,  which  were  afforded  some  weight;  and  (8)  State  Agency  medical  consultants  Drs.

Grant  and  Salmi's  opinions  that  Webb  does  not  have  any  severe  physical  impairments,  which

---

[31]      See 20 C.F.R. § 404.1527(c) for an explanation of what each of these factors entail.

were afforded heightened weight.  (Admin. R. at 19–21).  In addition, the ALJ fully explained

her decisions on what weight to afford each.  (*Id.*).  The ALJ, thus, met the requirements of 20

C.F.R. § 404.1527.  Similar requirements apply to State Agency consultants.  20 C.F.R. §

404.1527(e).[32]  In providing little weight to certain opinions of Webb's treating physicians, the

ALJ gave reasons for assigning such weight to the opinions of treating physicians as is required.

*See* 20 CFR §§ 404.1527(c)(2), 416.927(c)(2).[33]

Webb argues that the ALJ violated *Nevland v. Apfel* by relying on her own inferences

from medical reports.  (Webb's Mem. in Supp. at 19–20); (Webb's Reply at 2–5).  In *Nevland*

the Eighth Circuit stated that "[a]n administrative law judge may not draw upon his own

inference from medical reports."  *Nevland*, 204 F.3d 853, 858 (8th Cir. 2000) (internal citations

and quotations omitted).  In that case, "[t]he ALJ relied on the opinions of non-treating, non-

examining physicians who reviewed the reports of the treating physicians to form an opinion of

[the claimant's] RFC."  *Id.*  The Eighth Circuit held that the ALJ did not satisfy the duty to fully

and fairly develop the record and "the ALJ should have sought such an opinion from [the

claimant's] treating physicians or, in the alternative, ordered consultative examinations,

including psychiatric and/or psychological evaluations to assess [the claimant's] mental and

physical residual functional capacity."  *Id.*  In *Nevland*, there was "no **medical** evidence about

how [the claimant's] impairments affect his ability to function now."  *Id.* (emphasis in original).

Here, the Court is not convinced that the ALJ relied on her own assessment in making her

RFC and disability determinations.   As discussed previously, the ALJ provided a detailed

analysis of the inconsistency of the opinions of Drs. Olson and Swenson, for which there is

---

[32]    Section 404.1527(e) provides specific additional rules for State Agency medical and
psychological consultants, however, those rules are not dispositive here.
[33]    The reasons for not accepting the opinions of Webb's treating physicians are addressed
above.

support in the evidence in the record as a whole.  Moreover, unlike in *Nevland*, here, the ALJ had access to the opinion of a consultative examiner, Dr. Ochsendorf.  In addition, the ALJ did not solely rely on the opinions of non-treating, non-examining physicians in making her RFC and disability determinations—the ALJ reviewed all of the record evidence and provided a detailed analysis of the opinions of Drs. Swenson and Olson, giving explicit reasons when the opinions were afforded little weight.  *Daniels v. Astrue*, No. 12-CV-407 (PAM/AJB), 2013 WL 1339350, at *13 (D. Minn. Feb. 6, 2013) *report and recommendation adopted*, 2013 WL 1329028 (Apr. 1, 2013).  In addition, the Court disagrees with Webb's contention that because "the ALJ gave equal weight to everyone's assessment . . . [s]he relied on no one's assessment except her own." (Webb's Reply at 4).  Webb provides no citations in support of her assertion that when an ALJ affords multiple sources equal weight the ALJ is actually relying on his or her own assessment. In addition, the Court finds, to the contrary, that the ALJ considered all of the sources to which she afforded weight in reaching her determination, and thus, her decision is based on substantial evidence in the record as a whole.

### D.    Reliance on GAF Scores in Determining Disability

Webb argues reliance upon her GAF scores in denying her claim was error.  (Webb's Mem. in Supp. at 26).  Webb argues the ALJ should not have used her GAF scores to discount the opinions of the treating medical sources.  (*Id.* at 26–27).

The Commissioner argues that "[w]hile GAF scores do not have a direct correlation to limitations with respect to disability, they are still pieces of the medical record the ALJ can consider in the disability calculus."  (Commissioner's Mem. in Supp. of Mot. for Summ. J., "Commissioner's Mem. in Supp.") [Doc. No. 13 at 6].   The Commissioner argues that Webb's argument that the Commissioner is trying to "have it both ways" by saying GAF scores only are

pertinent in certain situations, mischaracterizes the ALJ's position as a fact-finder.  (*Id.* at 6–7).

Concerning Dr. Olson's supplemental responses to the Appeals Council that GAF scores should

not be used in disability determinations because Webb's cognitive problems were her main

problems and were not factored in to the GAF scores, the Commissioner notes that the ultimate

disability decision is reserved to the Commissioner and even though Dr. Olson argues cognitive

problems were Webb's primary problems, she also applied for disability on depression and

anxiety.  (*Id.* at 7).

In reply, Webb argues that the Commissioner "strains to find evidence in the record that

there was more to the ALJ's decision-making than looking at GAF scores."  (Webb's Reply at

7).  Webb argues that she is not basing her application on anxiety and depression and that the

ALJ "used the GAF scores as a shorthand to her decision and simply discounted any evidence

that militated against their use."  (*Id.* at 7).

GAF scores are not addressed in Section 12.00D and the Commissioner explained:

> We did not mention the GAF scale to endorse its use in the Social Security and
> SSI disability programs, but to indicate why the third sentence of the second
> paragraph of proposed 12.00D stated that an individual's medical source
> "normally can provide valuable additional functional information." To assess
> current treatment needs and provide a prognosis, medical sources routinely
> observe and make judgments about an individual's functional abilities and
> limitations. The GAF scale, which is described in the DSM-III-R (and the DSM-
> IV), is the scale used in the multiaxial evaluation system endorsed by the
> American Psychiatric Association. It does not have a direct correlation to the
> severity requirements in our mental disorders listings.

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.

Reg. 50746, 50764–65 (Aug. 21, 2000).

The ALJ did not improperly use Webb's GAF scores in her analysis.  First, the Court

does not agree with Webb's assessment that the ALJ essentially relied on the GAF scores in

reaching her determination.  To the contrary, the Court's review of the ALJ's decision reveals

consideration of much more evidence than just the GAF scores. *See* (Admin. R. at 16–21). Webb's argument that the Commissioner cannot "have it both ways" also fails because in making a disability determination "[the Commissioner] will always consider the medical opinions in [the] case record **together with the rest of the relevant evidence . . . receive**[**d**]." 20 C.F.R. § 404.1527(b) (emphasis added). The ALJ's consideration of Webb's GAF scores in rendering her disability determination, thus, was appropriate as the GAF scores were a part of the relevant record evidence in the case. *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("GAF scores are one factor in the [disability] determination."); *Mortenson*, 2011 WL 7478305 at *9–10 (citing *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010)).

Webb contends that the ALJ's use of her GAF scores violated the Commissioner's own policy providing that "[the GAF scale] does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings." (*Id.* at 27–28) (quoting 65 Fed. Reg. 50746, 50764–65). Webb's argument fails because the regulation states that there is no direct correlation between GAF scores and the severity of the Listings, but it does not prevent the consideration of GAF scores. *See id.* The ALJ, thus, could consider the GAF scores in making her determination because they represent a piece of evidence in the record. Moreover, the ALJ considered whether Webb met Listings for affective and anxiety-related disorders, characteristics of which would be included in GAF scores.

### E.     Credibility Determination

Webb argues that the ALJ's finding that she was not credible as to the intensity, persistence, and limiting effects of her symptoms was legally insufficient. (Webb's Mem. in Supp. at 29). Webb argues the ALJ failed to use the applicable credibility analysis factors. (*Id.* at 29–31).

*Polaski v. Heckler* outlines the appropriate credibility analysis.  739 F.2d 1320, 1322 (8th Cir. 1984).   In assessing subjective complaints of pain, an ALJ must examine several factors including:  "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322).   Other relevant factors are the claimant's work history and objective medical evidence.  *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999).  "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility."  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)).   The failure to address each *Polaski* factor separately does not render the ALJ's determination invalid.  *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000); *Hicks v. Astrue*, No. 10-CV-2930 (DWF/AJB), 2011 WL 3206960, at *11 (D. Minn. May 31, 2011) *report and recommendation adopted*, 2011 WL 3207049 (July 28, 2011).

"In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, [and] statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms. . . ." SSR 96-7P, 1996 WL 374186, at * 1 (July 2, 1996).   "'An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole.'" *Chong Vang v. Colvin*, 934 F. Supp. 2d 1054, 1094 (D. Minn. 2013) (PJS/JSM) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996)).   An ALJ finding a claimant not credible, however, must provide reasons for discrediting the claimant.  *Bakke v. Colvin*, No. 12-CV-538 (JNE/TNL),

2013 WL 4436178, at *5 (D. Minn. Aug. 16, 2013) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003).   An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole.  *Id.*  Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this Court defers to an ALJ's decisions on credibility.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).

Explicit discussion of the *Polaski* factors is the preferred practice in the Eighth Circuit, however, if an ALJ does not cite the *Polaski* factors but nonetheless cites and conducts a thorough analysis under 20 C.F.R. §§ 404.1529 and 416.929, then such a decision constitutes an adequate application of *Polaski* determination.[34]  *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (citing *Randolph v. Barnhart,* 386 F.3d 835, 842 (8th Cir. 2004)).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998). The ALJ cannot only rely on the lack of objective medical evidence in making his or her conclusion. *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

The Court concludes that the record establishes that the ALJ did evaluate the entire record, including Webb's testimony, as *Polaski* requires.   The ALJ found that Webb's impairments could be expected to cause the alleged symptoms but that her "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Admin. R. at 17).  The ALJ considered Webb's work history and daily activities,

---

[34]     Analysis under 20 C.F.R. §§ 404.1529 and 416.929 is similar to the *Polaski* factors.  *See* 20 C.F.R. §§ 404.1529, 416.929.

both of which are *Polaski* factors. (*Id.* at 18–19). In addition, the ALJ addressed the medical evidence, which establishes Webb's mild to subtle cognitive difficulties, but determined that these deficits were particularly detrimental in Webb's past work as a nurse, and Webb's intelligence supports her ability to engage in unskilled work. (*Id.* at 17–18). Finally, Webb's argument that the ALJ did not consider all of the *Polaski* factors does not render the decision invalid. *Lowe*, 226 F.3d at 979.

Concerning Webb's work history, the ALJ noted that her history was "outstanding" and "suggest[ed] strong work motivation and len[t] credibility to her allegations." (Admin. R. at 18). The ALJ found, however, that Webb's allegations focused on her past work as a nurse and the ALJ agreed that Webb could no longer work as a nurse, but did not believe that rendered her disabled under the SSA when the evidence showed that Webb had the ability to perform work consistent with the RFC. (*Id.*).

Webb's daily activities were consistent with the RFC, according to the ALJ. (*Id.* at 18–19). Webb argues that none of her activities of daily living lend "any support to a finding that Webb could keep up the persistence and pace required of [the jobs identified by the VE.]" (Webb's Mem. in Supp. at 31–32). Webb also argues that her ability to do a few chores does not equate to competitive work. (*Id.*).

"[D]aily activities, standing alone, do not disprove the existence of a disability, nonetheless, they are an important factor to consider in the evaluation of subjective complaints." *Chong Vang*, 934 F. Supp. 2d at 1096 (citing *Wilson v. Chater*, 76 F.3d 238, 241 (8th Cir. 1996)). The ALJ listed Webb's daily activities to include her ability to live independently, perform personal care independently, make simple meals, perform household chores, drive a car, shop, manage money and pay bills, independently attend medical appointments, and engage in

leisure activities.  (Admin. R. at 18–19).  Concerning Webb's argument that the ALJ improperly parsed the record and left out important facts in discussing Webb's daily activities, the ALJ relied on Webb's testimony, her function report, and Webb's description of her daily activities to Dr. Ochsendorf in detailing Webb's daily activities.  (*Id.*).  The ALJ listed activities of daily living which are supported by the evidence and also explained "the claimant testified she takes longer to complete tasks, sometimes ruminates, has difficulty multitasking and her attention to household chores has decreased . . . . "  (*Id.* at 19).  Although the cited evidence notes that Webb had difficulties in completing tasks due to her cognitive problems, the evidence also explained that she was able to complete them.  (*Id.* at 43–46, 253–57, 397).  Thus, the Court does not agree with Webb that the ALJ improperly parsed the evidence in the record because the ALJ noted that Webb had difficulties with concentration and initiation but was able to complete tasks.   In addition, the ALJ noted that Webb's completion of her function report in a detailed and complete manner and provision of detailed testimony at the hearing combined with Webb's daily activities to establish that she is able to perform simple, routine tasks.  (*Id.* at 18).  Webb is correct that the ability to complete a few chores does not constitute the ability to perform work, but a review of the ALJ's decision shows that much more than Webb's ability to perform a few chores was considered.  *See Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000) (citing *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998); SSR 96–8P).

Webb argues that the ALJ failed to address precipitating and aggravating factors, Webb's attempts to control her symptoms with medications and their side effects, and Webb's functional restrictions—all of which are *Polaski* factors.  (Webb's Mem. in Supp. at 32).  Specifically, Webb argues that the ALJ did not discuss Webb's "inability to focus, to filter out distracting stimuli, [or] to initiate activities. . . . "  (*Id.*).  Webb argues that the ALJ did not discuss "whether

Webb could be expected to use good judgment at a job or respond appropriately to supervisors, co-workers[,] and usual work situations." (*Id.*). The ALJ recounted Webb's treatment attempts in her discussion and concluded that her psychologically based symptoms are genuine but do not result in functional limitations beyond the RFC. (Admin. R. at 18). Despite Webb's contentions, the ALJ explicitly included Webb's inability to focus and filter noise, Webb's focus problems that limit her to short and simple instructions and limit her interaction with co-workers and the public to short and superficial contacts in her RFC determination. (*Id.* at 16).

Moreover, Webb's argument that not all of the *Polaski* factors were considered fails to recognize that "the failure to address each of the *Polaski* factors separately does not render the ALJ's determination invalid." *Leach v. Astrue*, No. 10-CV-4279 (SRN/JSM), 2011 WL 7468635, at *20 (D. Minn. Aug. 5, 2011) *report and recommendation adopted*, 2012 WL 760772 (Mar. 8, 2012) *aff'd*, 496 F. App'x 681 (8th Cir. Jan. 7, 2013) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000); *Lowe*, 226 F.3d at 972).

Here, the ALJ provided a thorough discussion of the evidence of record in determining that Webb's allegations were not entirely credible. *See* (Admin. R. at 17–19). In her analysis, the ALJ considered the record as a whole, including Webb's testimony, the objective medical evidence, and Webb's activities of daily living, and explained the inconsistencies between Webb's allegations, her daily activities, and the objective medical evidence leading the ALJ to find Webb could perform work consistent with her RFC.[35] The ALJ found Webb credible in that

---

[35]     Webb argues, without providing any supporting citations, that her daily activities do not show an ability to perform the work identified by the VE, as each of those jobs has production standards, and she could not meet them. (Webb's Mem. in Supp. at 31–32). Webb does not provide any substantiation of or support for this argument, and accordingly it is waived. *See Ollila v. Astrue*, No. 09-CV-3394 (JNE/AJB), 2011 WL 589037, at *11 (D. Minn. Jan. 13, 2011) *report and recommendation adopted*, 2011 WL 589588 (Feb. 10, 2011) (citing *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th

she could no longer work as a nurse.   However, the ALJ found Webb's current cognitive limitations did not prevent her from work consistent with her RFC and therefore Webb's contentions to the contrary were not fully credible. The ALJ also used the *Polaski* factors in her analysis.[36]

###     F.      Hypothetical Question

Webb argues that the ALJ's hypothetical to the VE was improper and when the proper limitations were applied, the VE testified that there were no jobs available for such an individual. (Webb's Mem. in Supp. at 33–34).

"In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."  *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999).  "'[T]he ALJ is only required to incorporate into the hypothetical those impairments and limitations which have been accepted as credible.'" *Gorton v. Astrue*, No. 06-CV-4903 (PJS/JSM), 2008 WL 583703, at *29 (D. Minn. Feb. 28, 2008) (quoting *Daniel v. Barnhart*, No. 01-CV-852 (JRT/ALB), 2002 WL 31045847, at *4 (D. Minn. Sept. 10, 2002)). Webb's reargues here that the ALJ should have relied on her own testimony and the opinions of her treating physicians in formulating hypothetical questions to the VE.  (Webb's Mem. in Supp.

---

Cir. 1994); *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1212 (7th Cir. 1993); *SEC v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992); *United States v. Zannino*, 89 F.2d 1, 18 (1st Cir. 1990); *Leer v. Murphy*, 844 F.2d 628, 635 (9th Cir. 1988); *Ball ex rel. Ball v. Astrue*, No. 1:06CV00059, 2008 WL 544878 (E.D. Ark. Feb. 25, 2008)).

[36]     Webb seems to argue that the ALJ did not properly consider third-party statements because although the ALJ found them credible, she explained that they did not rule out simple tasks.  (Webb's Mem. in Supp. at 33).  Webb argues that the third-party statements actually corroborate her difficulty with simple tasks.  (*Id.*).  Webb, however, provides only two sentences concerning the third-party statements and does not explicitly allege error in the ALJ's consideration of the third-party statements.  *See* (*id.*).  The ALJ considered the third-party statements in her analysis.  *See* (Admin. R. at 19).  To the extent Webb is making an argument about the ALJ's consideration of the third party statements, the argument is waived as Webb failed to frame and develop it.  *See Ollila*, 2011 WL 589037, at *11 (citations omitted).

at 33–35). This argument fails because the Court has already determined the ALJ properly discounted Webb's testimony and treating physician opinions in calculating Webb's RFC. The ALJ included all the limitations she found credible and supported by the record in her hypothetical and was not required to include evidence from Webb's testimony or treating physician opinions that were inconsistent with evidence in the record making her hypothetical proper. *See Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993).

## IV.    RECOMMENDATION

Based on all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.    Webb's Motion for Summary Judgment [Doc. No. 10] be **DENIED**;

2.    The Commissioner's Motion for Summary Judgment [Doc. No. 12] be **GRANTED**; and

3.    Judgment be entered and the case be dismissed.


Dated: April 16, 2014

                                        *s/ Steven E. Rau*
                                        STEVEN E. RAU
                                        United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **April 30, 2014**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.